**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **MELISSA M. NEYLON,** | **CASE NO. 1:16-CV-0712 AWI JLT** |
| **Plaintiffs** | |
| **v.** | **ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND ORDER ON PLAINTIFFS' MOTION TO AMEND** |
| **COUNTY OF INYO, WILLIAM R. LUTZE, RALPH DOUGLAS RICHARDS, MICHAEL DURBIN, and DOES 1-50,** | |
| **Defendant** | (Doc. No. 71, 72) |

     This case stems from the erroneous arrest by Inyo County Sheriff's deputies of Plaintiff Melissa Neylon ("Neylon"), pursuant to an outstanding warrant from Indiana for a Melissa Chapman ("Chapman"). The operative complaint is the Fourth Amended Complaint ("FAC"). Defendants now move for summary judgment on all claims alleged against them, and Neylon moves to file an amended complaint. For the reasons that follow, Defendants' motion will be granted with respect to Neylon's federal causes of action, and the Court will decline to exercise supplemental jurisdiction over the remaining state law claims and deny the motion to amend.

## SUMMARY JUDGMENT FRAMEWORK

     Summary judgment is proper when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome

of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at 899.  Summary judgment may not be granted "where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  Fresno Motors, LLC v. Mercedes Benz USA,

LLC, 771 F.3d 1119, 1125 (9th Cir. 2015); see also Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003). Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Fitzgerald v. El Dorado Cnty., 94 F.Supp.3d 1155, 1163 (E.D. Cal. 2015); Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). The parties have the obligation to particularly identify material facts, and the court is not required to scour the record in search of a genuine disputed material fact. Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010). Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. Nissan Fire, 210 F.3d at 1103.

## FACTS[1]

Neylon was born "Melissa Marie Smith" but has used three other names based on marriages: "Melissa Marie Cordell" from 1994 to 2000, "Melissa Marie Penny" from 2002 to 2006, and presently "Mellissa Marie Neylon." PUMF 1.

On December 4, 2015, see DUMF 1, Neylon was at the Inyo County Jail for employment purposes. See DUMF 2. As part of the entrance process, Neylon filled out a form that requested personal information, such as a copy of her driver's license, driver's license number, address, social security number, and previous names. See PUMF 3. Pursuant to jail procedures, a wants and warrants check is run before a person may enter the jail. See DUMF 3. Dispatcher Mary

---

[1] "PUMF" refers to "Plaintiff's Undisputed Material Fact" and "DUMF" refers to "Defendants' Undisputed Material Fact." Additionally, the parties each respond to many of their respective proposed facts with objections. Also, Defendants often state that a PUMF is undisputed for purposes of the motion, but then inconsistently make an objection. Unless otherwise noted or discussed in this order, the parties' various objections are overruled.

Marsh was provided with Neylon's divers license in order to check for warrants, probation, or parole. PUMF 5; <u>see also</u> DUMF 18. Marsh ran Neylon's license number through the Cal. DMV computer database. <u>See</u> PUMF 6. The search results returned Neylon's mailing address, her three previous names, and the following identifying information: brown hair, brown eyes, height of 5' 3" and weight of 115 lbs. <u>See</u> PUMF 7. Marsh then ran Neylon's birth date and current name through a database for wanted persons, supervised release, registered offenders, National Crime Information Center, and restraining Orders ("CLETS search"). <u>See</u> PUMF 8; <u>see also</u> DUMF 19. No information for Neylon was received from the CLETS search. <u>See</u> PUMF 9.

Marsh then ran the name "Melissa Smith" with a birthdate of March 2, 1977 through the CLETS Database. <u>See</u> PUMF 10. Marsh received four pages of information, including data related to both males and females with associated surnames and/or dates of birth. PUMF 11. Among the information returned for "Melissa Smith" was a reference to a warrant from Dearborn County, Indiana for Chapman for identity theft. PUMF 12; <u>see also</u> DUMF 20. The Indiana warrant was issued in 2004. <u>See</u> PUMF 2. Marsh thought that the following information regarding Chapman from the CLETS search matched Neylon: Chapman had used a birthdate of March 2, 1977, and Chapman had used the names "Melissa Marie Cordell," "Melissa Marie Penny," and "Melissa Marie Smith."[2] <u>See</u> PUMF's 13, 14; <u>see also</u> DUMF 20.

Based on the CLETS search, Marsh concluded that Neylon was Chapman, and took her results to Defendant Sgt. Douglas Richards, the jail supervisor responsible for day to day jail operations. <u>See</u> PUMF's 15, 16; <u>see also</u> DUMF 21. Marsh told Richards that Neylon was wanted on an Indiana warrant. <u>See</u> PUMF 17. Richards reviewed and compared the identifying information related to Neylon and Chapman, and concurred with Marsh that Neylon was wanted under the Indiana warrant for Chapman. <u>See</u> Richards Depo. 25:13-21. Richards had never been involved in doing a wants and warrants check. <u>See</u> PUMF 19. Marsh also showed Defendant Sheriff's Deputy Michael Durbin the results of her CLETS search of "Melissa Smith." PUMF 23. Marsh told Durbin that, based on her findings, Chapman used several different dates of birth,

---

[2] The information indicated that Chapman had utilized six different birthdates and fifteen different names/aliases. <u>See</u> PUMF 13.

names, and social security numbers, as reflected by the search printout.  <u>See</u> PUMF 25.  Durbin

accepted the explanations given to him by Marsh of the information on the CLETS printout.  <u>See</u>

Durbin Depo. 24:20-25:3.

At Marsh's direction, Durbin spoke with Neylon in the jail lobby and asked her for her

name and social security number.  <u>See</u> PUMF's 27, 28.  Neylon gave Durbin her name and social

security number.  <u>See</u> PUMF 29.  Durbin concluded that there was probable cause to believe that

Neylon was Chapman based on:  (1) the appearance of three identical "aliases" (Melissa Smith,

Melissa Cordell, and Melissa Penny); (2) the same listed height (5' 3"); (3) a similar listed weight

in that Neylon was listed at 115 lbs. and Chapman was listed at 130 lbs.; (4) the same listed eye

color (brown); (5) the appearance of an identical birthdate (March 2, 1977); and (6) the nature of

the charge (identity theft) which would involve the use of several identities.  <u>See</u> Durbin Depo.

73:25-74:10; <u>see also</u> PUMF 31; DUMF 20, 23(b).  Durbin verified with Marsh that she had

received confirmation from Dearborn County that the warrant was still valid.  <u>See</u> DUMF 20(8),

23(a).  Durbin was aware that Chapman reportedly had a tattoo on her right ankle, but considering

that the warrant was 11 years old and that tattoos can be removed, Durbin did not believe that the

absence of a tattoo on Neylon's right ankle would be sufficient to overcome the other

corroborating information.  <u>See</u> Durbin Dec. ¶ 10.

After speaking with Neylon and gathering information, Durbin left Neylon in the lobby.

<u>See</u> PUMF 30.  Durbin consulted Sgt. Bachman, his supervising sergeant who was present at the

jail.  <u>See</u> Durbin Dec. ¶ 12.  Durbin also consulted with Richards.  <u>See</u> PUMF 32.  Both Bachman

and Richards believed that there was probable cause to arrest Neylon based on the outstanding

Indiana warrant.  <u>See</u> Durbin Dec. ¶ 12; PUMF 32.

After consulting with Richards and Bachman, Durbin returned to Neylon, asked to speak

with her in a more private area of the jail, and asked if she knew that there was a warrant out of

Michigan for her arrest.  <u>See</u> PUMF's 33, 34; Durbin Dec. ¶ 12.  Neylon responded that it could

not be possible as she had never been to Michigan.  <u>See</u> PUMF 35.  Durbin instructed Neylon to

turn around, and then informed her that she was under arrest because of the Michigan warrant.

<u>See</u> PUMF's 36, 38.  Neylon told Durbin:  "You have the wrong person.  I have no idea what

you're talking about." PUMF 39. Durbin began handcuffing Neylon, and Neylon again protested that Durbin had the wrong person. See PUMF's 40, 41. Neylon turned to a coworker and instructed the coworker to contact Neylon's husband. See PUMF 42. Neylon again stated: "They have the wrong person. This is not right. They need to call Shawn." Id. Neylon was booked into the jail. See PUMF 49. Durbin left the jail, wrote his report, and had no further involvement with Neylon's arrest and incarceration. See PUMF 50. However, sometime within two weeks of the arrest, Durbin saw a photograph of Chapman and believed that Chapman and Neylon appeared similar but not identical. See Durbin Depo. 91:12-25.

During the booking and intake process, Neylon continued to protest to jail staff, including Richards, that they "had the wrong person," but staff just told her to stop talking. See PUMF 51, 52, 53, 55. Richards knew that Chapman had a tattoo on her right ankle. See Richards Dec. ¶ 7' Merin Dec. Ex. 6. Richards did not inspect Neylon's ankle. See Neylon Depo. 4522-46:1.[3] Richards did not believe the absence of a tattoo would "materially exonerated" Neylon because the tattoo could have been removed since the time the 2004 warrant had issued. See Richards Dec. ¶ 7. Jail staff asked Neylon about her nationality, to which she responded that she was Guamanian, Filipino, and Caucasian; jail staff twice asked her how to spell "Guamanian." See PUMF 58, 59. Richards asked Neylon multiple times to verify her name, asked about previous names used, whether she had lived in Florida or been to Indiana, or if she had tattoos on her legs. See PUMF 60. Neylon responded that she had family in Florida, jail staff had taken a picture of the one tattoo that she had which was on her back, and offered to show the tattoo. See PUMF 61, 62. Richards concocted a theory that Neylon was engaged in marital infidelity and that he had discovered it by catching Neylon at the jail with her male coworker. See PUMF 63, 65, 67. At some point, Richards and three jail personnel approached Neylon, and Richards told Neylon, "It's you. You're her." PUMF 68. Neylon did not know what Richards was talking about and asked, "Who her?" See PUMF 69.

Richards later called Shawn Neylon that day (December 4) and informed him that there

---

[3] Richards declares that he did inspect Neylon's ankle and did not see a tattoo. See Richards Dec. ¶ 7. As the non-movant, the Court credits Neylon's evidence as to this dispute. See Narayan, 616 F.3d at 899.

was a problem with Neylon's identity and that the jail intend to run a Livescan of Neylon's fingerprints. See PUMF 46. Shawn told Richards that Neylon had done nothing wrong. PUMF 47. Richards did not tell Shawn what the problem was with Neylon's identity or that she was being arrested and booked into the jail. PUMF 48.

Neylon's fingerprints were subject to a Livescan at Richards's request. PUMF 70. The Livescan results reflected that Neylon's fingerprints were associated with aliases "Melissa Penny," "Melissa Cordell," and "Melissa Smith." PUMF 72. Specifically, the results stated that "your subject has been identified by fingerprints as [Melissa Penny]," and listed Melissa Cordell, Melissa Smith, and Melissa Neylon as "AKA's;" Chapman's name does not appear on the Livescan results. See Merin Dec. Ex. 12. The Livescan results were based on Neylon's fingerprints having been "Livescanned" on at least two prior occasions. PUMF 73. The Livescan results of Neylon's fingerprints were matched with her own fingerprints from the prior occasions. PUMF 74. Richards erroneously interpreted the result of the Livescan as demonstrating that Neylon was Chapman. See PUMF 75. Inyo County Sheriff's Department never requested copies of Chapman's fingerprints for comparison with Neylon's. See PUMF 76.

The same day as Neylon's arrest, Inyo Sheriff's Department informed Dearborn County, Indiana that Chapman was in custody during an attempt to enter the jail. See PUMF 77. Dearborn County responded: "Warrant is valid and we will extradite." PUMF 78; see also DUMF 80.

On December 7, the Inyo Sheriff's Department requested that the Inyo County District Attorney file charges against Neylon. See PUMF 79. On the same day, the Inyo District Attorney's Office accepted the Sheriff's Department's request to file a felony complaint against Neylon, and a felony criminal complaint against Neylon was filed on December 8. See PUMF 80; DUMF 6. The Inyo District Attorney's Office investigated the matter, including contacting Indiana. DUMF 7.[4] The Inyo District Attorney's Office did not run any Livescan searches. See Merin Dec. Ex. 19.[5] The District Attorney's Office kept the Sheriff's Department apprised of the

---

[4] Neylon disputes that an "adequate investigation" occurred. However, DUMF 7 merely states that an investigation occurred, there are no representations as to the "adequacy" of that investigation. DUMF 7 is undisputed.

[5] PUMF 82 states that the District Attorney did not verify Richards's false statements regarding the Livescan resulting in a hit. See PUMF 82. However, the evidence cited in support of this PUMF is an e-mail from the Inyo District

status of the investigation. DUMF 8. Neylon retained counsel to represent her. See DUMF 9.

Neylon had her Preliminary Hearing on December 8, 2015, at which time it was determined that she would be afforded an Identity Hearing. DUMF 10.

Also on December 8, 2015, the Inyo Sheriff's Department received the Most Wanted flyer for Chapman, which included Chapman's picture, from Dearborn County. See DUMF 5. The flyer stated that Chapman may be continuing her identity theft scheme by going under "other stolen identities," she may be in Utah or somewhere on the West Coast, and that she has family in Florida and friends in Ohio and Indiana. See Merin Dec. Ex. 20.

On December 16, 2015, Neylon's counsel asked the Inyo District Attorney's Office to compare any identifying marks or tattoos of Chapman with Neylon. See PUMF 85. The District Attorney responded that Indiana did not have any identifying marks on Chapman, when in fact there was at least a right ankle tattoo on Chapman that had been identified. See PUMF 86; Merin Dec. Ex. 6.

On December 17, 2015, at the instruction of the Inyo District Attorney, the Inyo Sheriff's Department conducted a second Livescan of Neylon's fingerprints. See PUMF 87. The results of that scan did not match Neylon to Chapman, they merely matched Neylon's fingerprints to her own that she had previously provided when her name was Melissa Penny.[6] See PUMF 88. The same day, Neylon's attorney provided timesheets and declarations from Neylon's supervisor and coworkers that Neylon was in San Jose on June 6, 2002, a date when Chapman was in Indiana. See PUMF 89. Neylon's attorney advised the Inyo District Attorney that the only way to confirm whether the Livescans were reliable was to manually compare Neylon's fingerprints with Chapman's fingerprints, and urged the District Attorney to initiate that process. See PUMF 90.

On December 18, 2015, the Identity Hearing was held in the Inyo County Superior Court

Attorney's Office. See id.; Merin Dec. Ex. 19. The e-mail states that the District Attorney does not maintain fingerprints and does not run Livescan, it does not mention Richards or the two Livescans run in this case, and does not discuss how the District Attorney viewed the Livescan results or verification efforts, if any.

[6] It is unknown who conducted the second Livescan on behalf of the Inyo Sheriff's Department. There is no evidence that Richards or Durbin conducted the second Livescan or interpreted the results of the second Livescan. The evidence cited in support of PUMF 87 is simply the results of the second Livescan (Merin Dec. Ex. 23), and the evidence cited in support of PUMF 88 is the second Livescan result, deposition testimony from Richards regarding the first Livescan, and deposition testimony from Neylon that describes her prior Livescan experiences for work.

before Judge Brian Lamb.  See DUMF 11.  At the hearing, Richards was called by Deputy District Attorney Shepherd.  See PUMF 91.  In response to the question of whether the Livescan matched Neylon's prints with "information from Indiana," Richards replied that what Livescan does is identify somebody and "Live Scan identified this person whom we . . . had printed [i.e. Neylon] with a person out of Indiana [i.e. Chapman]."  See PUMF 91; Merin Dec. Ex. 13 at 36:22-37:3; Doc. No. 12-2 at ECF pp. 39-40.[7]  Richards testified that the Livescan results where the "biggest determining factor" in his opinion that Neylon was Chapman.  PUMF 92.  At the conclusion of the hearing, Judge Lamb determined that there was probable cause to believe that Neylon was Chapman and committed Neylon to the County Jail for 30 days.  See Neylon v. County of Inyo, 2016 U.S. Dist. LEXIS 161326, *20-*21 (E.D. Cal. Nov. 18, 2016); Doc. No. 12-2 at ECF p. 133-134.  Judge Lamb noted that what had been represented at the hearing was that the "Live Scan that was take of [Neylon] personally at the jail . . . matched the fingerprints for Melissa Chapman." PUMF 93.  After the Identity Hearing, Neylon was released on bail.  DUMF 13.  Chapman was in jail from December 4 to December 18, 2015.  PUMF 94.

At Dearborn County's request, the Inyo Sheriff's Department sent a hard copy of Neylon's fingerprints.  DUMF 14.  Dearborn County advised Inyo County that Chapman's fingerprints were located in Ohio, that a hard copy of Chapman's fingerprints had to be obtained from Ohio to conduct a comparison, and that a fingerprint comparison would be conducted.  See DUMF 15.

On December 22, 2015, Dearborn County advised the Inyo District Attorney that Chapman's fingerprints did not match Neylon's fingerprints.  See DUMF 16.  The same day, the Inyo District Attorney dismissed its felony complaint against Neylon.  See DUMF 17.

**I.    DEFENDANTS' MOTION**

    1.    First Cause of Action – § 1983 – Fourth Amendment False Arrest

---

[7] Neylon cites to and relies on portions of the Identity Hearing transcript in support of various PUMF's.  Defendants object that the transcript/portions of transcript were not properly authenticated and thus, the PUMF's are not established.  However, as part of a motion to dismiss filed by Defendants, this Court took judicial notice of the entire Identity Hearing transcript at Defendants' request.  See Neylon v. County of Inyo, 2016 U.S. Dist. LEXIS 161326, *3-*5 (E.D. Cal. Nov. 18, 2016).  The pages cited by Neylon in support of her PUMF's match the pages of the transcript that were judicially noticed during the motion to dismiss.  Cf. Doc. No. 12-2 at ECF pp. 4 to 141 with Merin Dec. Ex. 13.  Given that the transcript pages relied upon by Neylon are identical to those in the transcript that this Court judicially noticed at Defendants' request, there is no genuine dispute between the parties.  Defendants' unwarranted authentication objections are overruled.

*Defendants' Argument*

Defendants argue that probable cause existed to arrest Neylon under the Indiana warrant because both Chapman and Neylon had used the same three aliases, they both had the same height and eye color, they were both associated with an identical birthdate, and were within fifteen pounds of reported weight. Additionally, Richards argues that summary judgment should be granted because he did not make the arrest or the decision to arrest.

*Plaintiff's Opposition*

Neylon argues that there are several characteristics that undercut and contradict the existence of probable cause. First, although the appearance of three identical aliases might be significant if those were the only aliases used, the Defendants knew that Chapman had used thirteen additional aliases. That is, the significance of only three aliases out of sixteen is severally undercut. Similarly, the significance of one date of birth matching Chapman's is undercut by the fact that Chapman used five other birthdates. Second, reliance on a brown eye color and a height of 5' 3" (the average height for an American woman, per CDC website) are characteristics that are far too common to be probative. Third, Defendants disregarded the following facts that tended to dissipate probable cause: (1) warrant offense of identity theft, because numerous other identities were associated with Chapman; (2) Neylon's social security number did not match any of the numbers associated with Chapman; (3) Neylon's weight was 15 lbs. lighter than Chapman's reported weight; (4) Chapman's hair color was reported as blonde, but Neylon's hair color was brown; (5) Chapman's race is listed as "white," while Neylon listed her race as Guamanian, Filipino, and Caucasian; (6) Neylon did not have a tattoo on her right ankle; and (7) Neylon denied to Richards that she had ever been to Indiana. Therefore, probable cause did not exist.

*Legal Standard*

"[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." Hill v. California, 401 U.S. 797, 802 (1971). If the wrong person is arrested under a facially valid warrant, "the question is whether the arresting officers had a good faith, reasonable belief that the arrestee was the subject of the warrant." Sharp v. County of Orange, 871 F.3d 901, 910 (9th Cir.

2017); Rivera v. County of Los Angeles, 745 F.3d 384, 389 (9th Cir. 2014); see also Hill v. Scott, 349 F.3d 1068, 1072 (8th Cir. 2003). "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment . . . ." Hill, 401 U.S. at 804; Rivera, 745 F.3d at 389. The reasonableness of the officer's belief is determined "by looking at the totality of the circumstances surrounding the arrest . . . ." Scott, 349 F.3d at 1073; United States v. Glover, 725 F.2d 120, 122 (D.C. Cir. 1984); see also Sharp, 871 F.3d at 909. The facts known by the officer and the totality of the circumstances as they existed at the time the arrest was made are the facts and circumstances that are analyzed. See Sharp, 871 F.3d at 909 (". . . we analyze only the specific facts that confronted the deputies during the arrest."); Rosenbaum v. Washoe Cnty., 663 F.3d 1071, 1076 (9th Cir. 2011); Neylon, 2016 U.S. Dist. LEXIS 161326 at *19.

"Probable cause" does not require "certainty," does not require a "preponderance of the evidence," and does not require a *prima facie* showing, it simply requires a "fair probability." See United States v. Gourde, 440 F.3d 1065, 1069, 1073 (9th Cir. 2006) (en banc). Police officers may not disregard facts that tend to dissipate probable cause. Sialoi v. City of San Diego, 823 F.3d 1223, 1232 (9th Cir. 2016); Ramirez v. City of Buena Park, 560 F.3d 1012, 1023 (9th Cir. 2009). However, the "fact that other inferences are possible does not mean that there is a triable issue of fact as to whether there was probable cause," Hart v. Parks, 450 F.3d 1059, 1067 (9th Cir. 2006), "law enforcement officers do not have to rule out the possibility of innocent behavior." Ramirez, 560 F.3d at 1024. Probable cause is an objective standard. United States v. Magallon-Lopez, 817 F.3d 671, 675 (9th Cir. 2016). "Where the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts, it is appropriate for [the] court to decide whether probable cause existed at the time [the officer] arrested [the plaintiff]." Peng v. Hu, 335 F.3d 970, 979-80 (9th Cir. 2003); see Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1146 (9th Cir. 2012); Hart, 450 F.3d at 1066-67.

*Discussion*

a.    Durbin

1    (1).    <u>Constitutional Violation</u>[8]

2         At the time of Neylon's arrest, there was no photograph of Chapman to compare with

3    Neylon.  <u>See</u> DUMF 5.  The information available to Durbin was the information returned from

4    the CLETS search.  That information revealed that: (1) there was an Indiana warrant for Chapman

5    that was issued in 2004; (2) Chapman was wanted for felony identity theft; (3) Chapman was 5'

6    3", had brown eyes, weighed 130 lbs., and had blonde hair; (4) among 6 known birthdates used by

7    Chapman was March 2, 1977 (her real birthday was February 28, 1978); (5) Chapman had a tattoo

8    on her right ankle; (6) Chapman's race is listed as "W," which appears to stand for "white"; and

9    (7) among the 16 known aliases used by Chapman were "Melissa Marie Smith," "Melissa Marie

10   Penny," and "Melissa Marie Cordell."  Merin Dec. Ex. 3; Durbin Dec. ¶¶ 7-10.  Durbin was also

11   informed that the Indiana warrant was still valid.  <u>See</u> Durbin Dec. ¶ 11.

12        Neylon shares many of these characteristics.  Like Chapman, Neylon has brown eyes, has

13   used the names "Melissa Marie Smith," "Melissa Marie Penny," and "Melissa Marie Cordell" in

14   the past, has provided a birthday of March 2, 1977, and is 5' 3".  Further, Chapman's purported

15   weight of 130 lbs. in 2004 and Neylon's 2015 purported weight of 115 lbs. are very similar,

16   especially considering that there is a span of eleven years between weights.  Finally, as discussed

17   below, it is not unreasonable to describe Neylon as Caucasian or white.  These similarities are not

18   insignificant.  What they reveal is that Chapman and Neylon share the same gender, a similar

19   build, three prior names, one purported birthday, are of a similar age, and can be described as

20   being of the same race.  Collectively, the Court concludes that the shared characteristics between

21   Neylon and Chapman are sufficient as a matter of law to support a good faith and reasonable

22   belief that Neylon was Chapman.  <u>Cf.</u> <u>Rivera</u>, 745 F.3d at 389 (holding probable cause existed for

23   an arrest where name and date of birth of the plaintiff matched the subject of the warrant and there

24   was only a 1 inch height difference and a 10 pound weight difference); <u>Martinez v. City of N.Y.</u>,

25   340 F. App'x 700, 701-02 (2d Cir. 2009) (holding that probable cause existed to arrest the plaintiff

26   when the plaintiff had the same name and birthdate as the subject of the warrant and that

27

28   ――――――――――――――――――
[8] The relevant facts are not in dispute, which makes the existence of probable cause a legal question for the Court.
<u>See</u> <u>Tsao</u>, 698 F.3d at 1146; <u>Hart</u>, 450 F.3d at 1066-67; <u>Peng</u>, 335 F.3d at 979-80.

differences in skin tone, 2 inches in height, and 20 pounds in weight were too minor to undercut probable cause). That is, Durbin had probable cause to arrest Neylon pursuant to the warrant for Chapman.

Neylon's arguments do not sufficiently undercut the reasonableness of Durbin's belief that Neylon was Chapman. First, it is true that Chapman and Neylon's purported weights are not an exact match. However, the Ninth Circuit has recognized that a weight difference of 10 pounds is not sufficient to undercut a reasonable belief as to identity, see Rivera, 745 F.3d at 389, and other courts have found that weight differences of 20 pounds are not sufficient. See Martinez, 340 F. App'x at 701 (holding *inter alia* that a 20 pound weight difference was too minor to undercut the reasonable belief); Rodriguez v. United States, 54 F.3d 41, 46 (1st Cir. 1995) (finding that "slight discrepancies" of 3 inches in height and 20 pounds in weight did not undermine the reasonable belief that the plaintiff was the subject of a 1975 warrant). The 15 pound weight difference is a minor difference, see id., especially considering that it is a matter of common knowledge and experience that a person's weight will fluctuate over time and throughout life, either voluntary or involuntary, and there is an eleven year gap between the warrant and the arrest.

Second, although Chapman's hair color is different from Neylon's, hair color is something that can readily be changed through cosmetologists or at home hair coloring kits. Considering that the warrant information was eleven years old and the ease with which anyone can change their hair color, the difference in hair color is minor and does not undercut a reasonable belief that Neylon was Chapman.

Third, accepting for purposes of this motion that the average height of an adult American female is 5' 3", that does not undercut probable cause. First, while perhaps 5' 3" is the average height, there are wide range of heights for females in the United States. The fact remains that there was no deviation whatsoever in height between Neylon and Chapman. Second, height was one piece of information that was collectively considered and supportive of the belief that Neylon was Chapman. Isolating the characteristic of height is not proper. See Sharp, 853 F.3d at 990 (courts consider the *totality* of the circumstances confronting the officer to determine whether a belief of identity is reasonable); Hart, 450 F.3d at 1067 (holding that probable cause is based on

"cumulative information" and that "atomizing" information for independent examination is improper). The same is true of eye color. While brown eyes may be common, so are green, blue, and hazel eyes. Both Neylon and Chapman had the same eye color. It is another piece of information that supports the conclusion that Neylon was Chapman.

Fourth, Neylon is correct that the race information provided by CLETS did not exactly match the race that Neylon gave. It is the Court's understanding that the additional races of Guamanian and Filipino are not part of any official documentation, rather they are in this case because Neylon chose to describe her race *after* the arrest as Filipino, Guamanian, and Caucasian. See PUMF 58. However, the legality of an arrest is determined by examining the facts and circumstances at the time of the arrest, not by examining information obtained post-arrest. See Sharp, 871 F.3d at 909; Rosenbaum, 663 F.3d at 1076. Prior to or at the time of arrest, there is no evidence that Neylon identified her race to Durbin or to any other jail staff. Although a color photograph has been submitted of Neylon at the time of her arrest, Neylon's skin tones as depicted in the photograph are not so different from the range of what may be described as "white" or "Caucasian" as to sufficiently undercut the belief that Neylon was Chapman. See Martinez, 340 F. App'x at 701-02 (holding that difference in *inter alia* skin tone was a minor difference that did not undercut a reasonable belief that the arrestee was the subject of the warrant); Doc. No. 51 at p.8 (side by side color photos of Chapman and Neylon); see also Doc. No. 12-2 at ECF p.127 (Judge Lamb examining picture of Chapman at the identity hearing and stating that the resemblances between Chapman and Neylon were "startling" and that Neylon "looks remarkably like [Chapman]"). Further, the CLETS printout indicated that Chapman's race was white, and Neylon included Caucasian in her own description of her race. The terms "white" and "Caucasian" are often used synonymously. See Spurlock v. Fox, 716 F.3d 383, 387 (6th Cir. 2013); Mozumdar v. United States, 299 F.2d 240, 243 (9th Cir. 1924); Abboud v. IBM, 2006 U.S. Dist. LEXIS 21128, *14 (N.D. Cal. Apr. 7, 2006). Therefore, Neylon's self-reported race is sufficiently consistent with CLETS's racial identification as "white."[9] This is not a situation where Neylon was

---

[9] There has been no information submitted by the parties regarding how CLETS expresses racial information. It is unknown whether it is even possible for CLETS to make a racial identification that includes more than one race, especially considering that Chapman's race was identified with only a "W."

obviously of a different race from the "white race" indicated by CLETS. As evidenced by

Neylon's own description, racial descriptions are not always easy to make. If an individual may

reasonably be viewed or described as belonging to a particular race, differences in skin tones

within that racial classification are generally minor differences for purposes of probable cause.

See Martinez v. City of N.Y., 2008 U.S. Dist. LEXIS 49203, *2-*3 (S.D. N.Y. June 27, 2008)

(finding only a minor difference between the arrestee and the subject of the warrant where one was

Hispanic and described as having a dark skin tone, while the other was also Hispanic but described

as "light skinned"), aff'd Martinez, 340 F. App'x at 701-02. Therefore, that Neylon may self-

report as being two other races in addition to "Caucasian" is a minor difference with the CLETS

information that does not undercut reasonable suspicion.[10] See id.

Fifth, the parties agree that Neylon did not have a tattoo on her right ankle, but the CLETS

information indicated that Chapman did. However, while tattoos are generally permanent, they

can be removed. Because the information in the CLETS was eleven years old, and tattoos can be

removed, the absence of a tattoo on Neylon's ankle is a minor difference that does not sufficiently

undercut the reasonable belief that Neylon was Chapman.[11]

Sixth, it is true that the social security number provided by Neylon did not match any

social security number associated with Chapman, as reflected in the CLETS printout. However,

---

[10] Neylon cites *Ingram v. City of Columbus*, 185 F.3d 579, 596 (6th Cir. 1999) for the proposition that differences in skin tone are material differences. In *Ingram*, undercover officers pursued a man into a private residence. The man had just attempted to purchase drugs from an undercover officer. The officers went into the house, went down to the basement, and arrested a man who was napping on the couch. At the house, officers determined that they had arrested the wrong man, went back to the basement, and arrested the real drug dealer. The Sixth Circuit held that genuine issues of fact existed as to whether the officers had probable cause to arrest the innocent man, Ray Womack. See id. at 596. The Sixth Circuit found a dispute for two reasons. First, Womack was asleep on a couch in the basement, while the drug dealer had been in headlong flight and would have been out of breath, not peacefully napping. Second, Womack had a light complexion, but the drug dealer was described as having a very dark complexion. The Sixth Circuit found that the men "did not even resemble" each other. Id. Here, there is no headlong flight, and unlike the officers who were pursuing the drug dealer, Durbin had not actually seen Chapman prior to his arrest of Neylon. That is, the officers in *Ingram* saw the drug dealer before the arrest. Durbin merely had a printout that generally described Chapman's race as "W." The Court finds that *Martinez*, rather than *Ingram*, is on point.

[11] There is no evidence that describes the shape or size Chapman's ankle tattoo. More importantly, there is little evidence with respect to tattoo removal. Richards's deposition indicates that his son has had tattoos removed and that following the removal process, Richards could not tell that a tattoo had been present. See Richards Depo. 28:8-24. Richards conceded that in some cases there may be a "blemish" where the tattoo had been. See id. However, there is no evidence from any witness who professes to have expertise in the realm of tattoo removal, and no evidence indicates that some sort of blemish or scar is normally present following the removal of a tattoo.

the crime at issue is identity theft. That a given social security number did not match numbers that were known to have been used by Chapman in 2004 could simply mean that the identity thief was using new numbers or that law enforcement was not aware of all the social security numbers that Chapman had used. This is a minor discrepancy that does not undercut the reasonable belief that Neylon was Chapman.

Seventh, it is true that multiple aliases and multiple birthdates were used by Chapman. However, the fact remains that one of those birthdates was Neylon's birthdate and three of the names were names that had actually been used by Neylon. Hits on three "aliases" is more significant than hits on one name or two. It is unclear why the existence of other aliases and birthdates used by Chapman in the course of identity theft should undermine probable cause. That more than one name was matched points more to identity than to lack of identity.

In sum, Durbin was faced with a valid warrant and multiple pieces of significant information on Chapman that matched Neylon. Both individuals were of the same height, similar weight, had the same color eyes, used the same birthday, had used the same three names in the past, and could be described as Caucasian.[12] Neylon is correct that there were differences, but the differences are explainable considering the passage of time, the nature of the crime involved, and the non-permanent nature of the differences identified. The differences are minor, and the Court is unaware of a case in which similar differences were sufficient to undercut a reasonable but mistaken belief in identity. The similarities and shared identifiers between Neylon and Chapman are sufficient for probable cause and a reasonable belief that Neylon was Chapman. Therefore, summary judgment in favor of Durbin on this claim is appropriate.

(2) Qualified Immunity

Qualified immunity applies when an official's conduct does not violate clearly established

---

[12] Neylon appears to fault Durbin for accepting Marsh's explanations of the CLETS results and for not independently investigating. However, Durbin spoke to Neylon before making the arrest, observed her physical appearance, matched aspects of her appearance to Chapman, and confirmed her uses of the names Penny, Cordell, and Smith. Thus, Durbin determined that Neylon and Chapman shared important identifiers. Neylon does not explain whether Marsh provided incorrect information, whether the information was obviously incorrect, or otherwise explain why Durbin could not rely on the information that Marsh relayed. Cf. Green v. City & Cty. of S.F., 751 F.3d 1039, 1045-46 (9th Cir. 2014) (citing Motley v. Parks, 432 F.3d 1072, 1081 (9th Cir. 2005) and explaining that officers may rely on information provided by other officers, but that officers also a have duty to further investigate if insufficient details are relayed).

statutory or constitutional rights of which a reasonable person would have known. White v. Pauley, 137 S.Ct. 548, 551 (2017). Officers are entitled to qualified immunity under § 1983 unless (1) the officers violate a federal a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." District of Columbia v. Wesby, 138 S.Ct. 577, 589 (2018); White, 137 S.Ct. at 551. "Clearly established" means that the statutory or constitutional question was "beyond debate," such that every reasonable official would understand that what he is doing is unlawful. See Wesby, 138 S.Ct. at 589; Vos v. City of Newport Beach, 892 F.3d 1024, 1035 (9th Cir. 2018). This is a "demanding standard" that protects "all but the plainly incompetent or those who knowingly violate the law." Wesby, 138 S.Ct. at 589 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)). To be "clearly established," a rule must be dictated by controlling authority or by a robust consensus of cases of persuasive authority. Id.; see also Perez v. City of Roseville, 882 F.3d 843, 856-57 (9th Cir. 2018) (noting that Ninth Circuit precedent is sufficient to meet the "clearly established" prong of qualified immunity). In examining whether a rule/right is clearly established, courts are to define the law to a "high degree of specificity," and not "at a high level of generality." Wesby, 138 S.Ct. at 590. The key question is "whether the violative nature of particular conduct is clearly established" in the specific context of the case. Vos, 892 F.3d at 1035 (quoting Mullenix v. Luna, 136 S.Ct. 305, 308 (2015)). Although it is not necessary to identify a case that it is "directly on point," generally the plaintiff needs to identify where an officer acting under similar circumstances was held to have violated federal right. White, 138 U.S. at 577; Vos, 892 F.3d at 1035; Felarca v. Birgeneau, 891 F.3d 809, 822 (9th Cir. 2018); Shafer v. City of Santa Barbara, 858 F.3d 1110, 1118 (9th Cir. 2017). Whether a constitutional right was violated is generally a question of fact for the jury, while whether a right was clearly established is a question of law for the judge. Morales v. Fry, 873 F.3d 817, 823 (9th Cir. 2017).

Here, as discussed above, Durbin had probable cause to arrest Neylon. Nevertheless, in the alternative, if Durbin did not have probable cause to arrest Neylon, then qualified immunity is appropriate. Neylon has identified no cases in which the number of identifiers that were within Durbin's knowledge was found to not create probable cause, nor has Neylon cited cases in which

the types of differences discussed by Neylon were sufficient to undercut probable cause. It is Neylon's burden to identify such cases. See Vos, 892 F.3d at 1035; Felarca, 891 F.3d at 822; Shafer, 858 F.3d at 1117-88. In the absence of cases that are similar to the facts in this case at the time of arrest, Durbin is entitled to qualified immunity because the right to be free from arrest given the shared identified characteristics between Neylon and Chapman was not "clearly established." See Wesby, 138 S.Ct. at 589-90; White, 137 S.Ct. at 551, 577; Vos, 892 F.3d at 1035; Felarca, 891 F.3d at 822; Shafer, 858 F.3d at 1117-18.

       b.      Richards

       (1)      Constitutional Violation

The Ninth Circuit has indicated that an officer's "meaningful" participation in a collaborative decision to engage in unconstitutional conduct constitutes "integral participation." See Keates v. Koile, 883 F.3d 1228, 1241-42 (9th Cir. 2018); accord Sjurset v. Button, 810 F.3d 609, 619 (9th Cir. 2015) (finding no integral participation of officers who removed children from a household were not "privy to any discussions, briefings or *collective decisions*" made by the agency "in its protective-custody determination.") (emphasis added). The Court will assume without deciding that Richards's offering his opinion that probable cause existed constitutes "meaningful participation" in a collective decision that probable cause existed and that Neylon should be arrested. Cf. Keates, 883 F.3d at 1241-42 (holding that allegations that defendants "collaborated on the issuance of temporary custody notice" were sufficient to indicate meaningful participation). However, as discussed above, the arrest by Durbin was not unconstitutional. The Indiana warrant was valid and there was probable cause to believe that Neylon was Chapman, based on the significant shared identifiers between the two women; the evidence was sufficient to have a reasonable belief that Neylon was Chapman. See Sharp, 871 F.3d at 910; Rivera, 745 F.3d at 389. Therefore, Richards was not an integral participant in an unconstitutional arrest.[13]

---

[13] Neylon's opposition also discusses an officer's liability for failing to intervene to stop a constitutional violation, e.g. United States v. Koon, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), or the proposition that an officer is liable for setting in motion a series of acts that he knows or reasonably should know would cause others to inflict a constitutional injury. E.g. Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978). Again, because the arrest was supported by probable cause, there was no constitutional violation to stop and no series of actions were set in place that lead to an unconstitutional arrest.

(2)    Qualified Immunity

2        In the alternative, for the reasons discussed above, even if Richards made the

3 arrest/integrally participated, an officer in Richards's position could reasonably but mistakenly

4 believe that probable cause existed to arrest Neylon under the warrant for Chapman because the

5 law was not clearly established that the arrest would be unlawful considering the shared

6 characteristics/identifiers of Neylon and Chapman.

7        2.    Second Cause of Action – § 1983 – Fourteenth Amendment Inadequate Investigation

8        *Defendants' Argument*

9        Defendants argue that there are no significant differences between Neylon and Chapman

10 that would trigger additional investigation.  There were many similarities between Neylon and

11 Chapman that indicated Neylon was the subject of the Indiana warrant.  Further, Richards

12 conducted a reasonable investigation by speaking with Neylon and her husband.  Further,

13 Dearborn County was contacted and they sent a wanted flyer that had a picture of Chapman that

14 resembled Neylon and later indicated that they would perform a fingerprint comparison.  Further,

15 the Inyo District Attorney investigated the case.  Alternatively, qualified immunity is appropriate

16 because there were no significant differences between Neylon and Chapman.

17        *Plaintiff's Opposition*

18        Neylon argues that Durbin and Richards violated her rights by not checking her identity

19 through fingerprint comparisons or obtaining Chapman's criminal history.  Further, Durbin

20 ignored the significant differences between Neylon and Chapman, as discussed with respect to the

21 first cause of action.  With respect to Richards, he did not conduct a reasonable investigation,

22 rather he was only injecting himself into a situation that he believed involved marital infidelity.

23 Neylon also argues that qualified immunity is improper because Ninth Circuit authority required

24 further investigation when significant differences existed, and also required that procedural

25 safeguards be in place to verify identity.

26        *Legal Standard*

27        Generally, law enforcement officers who execute an arrest warrant are not constitutionally

28 required to investigate independently ever claim of innocence based on a claim of mistaken

identity, nor are officers who maintain custody of an accused constitutionally required to perform error-free investigations of claims of mistaken identity. Baker v. McCollan, 443 U.S. 137, 145-46 (1979). However, it is possible for an incarceration based on mistaken identity to violate the Due Process Clause of the Fourteenth Amendment. Garcia, 817 F.3d at 640; Rivera, 745 F.3d at 390. A mistaken incarceration violates Due Process in at least two situations: "(1) the circumstances indicated to the defendants that further investigation was warranted, or (2) the defendants denied the plaintiff access to the courts for an extended period of time." Garcia, 817 F.3d at 640; Rivera, 745 F.3d at 391. The cases falling under the "further investigation" category involve "significant differences" between the arrestee and the true warrant subject. Garcia, 817 F.3d at 640; Rivera, 745 F.3d at 391

*Discussion*

a.    Richards

    (1)    Constitutional Violation

This case does not involve a denial of access to the courts. There is no dispute that Neylon received a preliminary hearing on December 8 and an Identity Hearing on December 18. Therefore, Neylon must demonstrate that further investigation was necessary due to significant differences between herself and Chapman. See Garcia, 817 F.3d at 640; Rivera, 745 F.3d at 391.

The Ninth Circuit has found "significant differences" that warranted further investigation in several cases. In *Garcia v. County of Riverside*, the arrestee repeatedly complained that there was a mistaken identification, there was a 9 inch height and 40 pound weight difference between the arrestee and the subject of the warrant, and the arrestee's California Criminal Identification and Information ("CII") number did not match the CII number of the warrant's subject.[14] Id. at 638. In *Gant v. County of L.A.*, 772 F.3d 608, 618 (9th Cir. 2014), there was a 7 inch height and a 120 pound weight difference between the arrestee and the subject of the warrant. In *Fairley v. Luman*, 281 F.3d 913, 915 (9th Cir. 2002), the arrestee and the subject of the warrant were twin brothers. There was a 66 pound weight difference between the arrestee and the subject of the

---

[14] Case law indicates that the California Department of Justice assigns CII's and that the CII's are fingerprint based. See Gant v. County of L.A., 772 F.3d 608, 611-12 (9th Cir. 2014). There is no indication that Chapman had a CII.

warrant, the arrestee had a different first name from the subject of the warrant, and the booking

sergeant knew that the arrestee had a twin brother.  See id.  Although not a Ninth Circuit case, the

Ninth Circuit did briefly describe *Cannon v. Macon Cnty*, 1 F.3d 1558, 1563 (11th Cir. 1993) in

*Rivera* as a case involving "significant differences."  See Rivera, 745 F.3d at 391.  The descriptive

information on Cannon's driver's license differed significantly from the description of the wanted

individual provided by the National Crime Center printout, and Cannon's physical makeup did not

match the physical makeup of the wanted individual.  See id.; Cannon, 1 F.3d at 1563.[15]  Finally,

in *Lee v. City of L.A.*, 250 F.3d 668, 677-78 (9th Cir. 2001), the arrestee had obvious mental

incapacitation and did not match the physical characteristics of the true subject of the warrant, who

had been convicted of embezzlement and had absconded from a New York work release

program.[16]

Here, unlike *Garcia*, *Gant*, and *Fairley*, there is no material difference in height or weight

between Neylon and Chapman.  Neylon and Chapman are the same height, and case law indicates

that the 15 pound weight difference is minor and insignificant (especially considering the eleven

year gap between the arrest and the warrant).  Like *Lee*, there is a somewhat sophisticated crime at

issue, but unlike *Lee*, there is no indication that Neylon suffers from any obvious mental

incapacitation.  Unlike *Lee* and *Cannon*, the physical makeup and descriptors of Neylon are very

similar to that of Chapman.  The only differences that could have been known to Richards were

the difference in hair color, the tattoo on Chapman's ankle, and the possible difference in skin tone

between Chapman and Neylon as evidenced by the wanted flyer that was received by Inyo County

on December 8.  As discussed above, hair color can easily be changed and tattoos can be removed.

Neither are necessarily immutable characteristics, especially considering the eleven year gap

between the arrest and the Indiana warrant.  Further, as discussed above, both Chapman and

Neylon can reasonably be described as Caucasian.  To the extent that there exists a difference in

---

[15] The specific physical characteristics that differed are not identified.  See Cannon, 1 F.3d at 1563.

[16] The specific physical characteristics that differed are not identified.  See Lee, 250 F.3d at 678.  However, an "identification packet" on the warrant's subject, that included the subject's fingerprints, was sent from New York to Los Angeles County.  See id.

skin tone, such a difference is minor and does not undercut a reasonable belief of identity or necessitate further investigation.  See Martinez, 340 F. App'x at 701-02.

Neylon points out that Richards has falsely described the results of the Livescan fingerprinting.  A Livescan was run on December 4 at Richards's request.  See PUMF 70.  The results were received the same day.  See Merin Dec. Ex. 12.  The results stated that Neylon was identified by fingerprints as Melissa Penny.  See id.  The March 2, 1977 birthdate for Penny is identified, a CII is listed, Neylon's height, weight, hair color, eye color, and race are all listed,[17] and "aka's" are listed as Melissa Neylon, Melissa Cordell, and Melissa Smith.  See id.  Chapman's name does not appear anywhere on the December 4 Livescan.  See id.  The second Livescan on December 17, which was conducted pursuant to a request from the Inyo District Attorney's Office, produced identical results as the December 4 Livescan.  Cf. Merin Dec. Ex. 12 with Merin Dec. Ex. 23.  Chapman's name does not appear on the December 17 Livescan.  See Merin Dec. Ex. 23.

Neither side has cited any expert testimony regarding Livescan.  The Court understands that Livescan analyzes fingerprints.  In *Garcia*, the Ninth Circuit explained the Livescan process:

> A booked individual is electronically fingerprinted through a system called "Livescan."  The Livescan image is then sent to the California Department of Justice (CDOJ), which responds in one of two ways. If the arrestee's fingerprints are already on file, the subject's criminal identification and information (CII) number and criminal history are sent to the arresting agency. If the arrestee's fingerprints are not on file, a new CII number is assigned. This number is linked to fingerprints, name, birth date, address, and other identifiers such as Social Security number.

Garcia, 817 F.3d at 638; see also Gant, 772 F.3d at 612 (describing the same process and noting that results are usually received by from CDOJ in a few minutes and that CDOJ will assign a CII number if a person is not already in the Livescan database).  Thus, the Court understands that Livescan is maintained and run by CDOJ.  Livescan responds based on whether the arrestee's fingerprints are in the system.  In either case, a CII will result, either as a previously issued number (because the arrestee is already in the system) or as a newly issued number (because the arrestee was not previously in the system).

---

[17] This information on the Livescan report matched the information given to Inyo County personnel by Neylon (brown eyes, brown hair, 5' 3" tall, 115 lbs.), except that the Livescan indicated that Neylon's race was "unknown."  See Merin Dec. Ex. 12.

With the above understanding of Livescan, the Court cannot hold that the absence of Chapman's name on the Livescan results was a "significant difference" between Neylon and Chapman.  Livescan appears to be a California "system."  There is no evidence that Chapman's fingerprints were part of the Livescan database.  From the Ninth Circuit's discussions in *Garcia* and *Gant*, if Chapman was never arrested in California, then her fingerprints likely would not be in the Livescan database.  Cf. Garcia, 817 F.3d at 638.  And if Chapman's fingerprints are not in the Livescan system, then Chapman's name would never appear in a Livescan result.  In the absence of further information, this means that the results of the Livescans do not definitively show either that Neylon was Chapman or that Neylon was not Chapman.  All that can be said of the Livescan results in this case is that Neylon's actual prints were in the system and associated with her prior married names of Melissa Penny, Melissa Cordell, and Melissa Smith.  That Chapman's name does not appear could equally mean either that Chapman is not in the system or that Neylon is not Chapman.  The results do not undermine the significant facts that both Neylon and Chapman were the same height, essentially the same weight, had the same eye color, had used three identical names in the past, could both be described as Caucasian, and used the same birthdate.  Further, Neylon admitted to having family in Florida and she was arrested in California.  This is consistent with information contained in the Dearborn County wanted flyer, which indicated that Chapman could be on the West Coast using a false name and had family in Florida.  See Merin Dec. Ex. 20.  Without more from Neylon regarding the nature of Livescan, the Court holds that the absence of Chapman's name from the Livescan results is not a "significant difference."

Relying generally on *Fairley* and *Alvarado v. Bratton*, 299 F. App'x 740 (9th Cir. 2008), Neylon also argues that Richards did not utilize procedural safeguards to ensure that she was not misidentified.  The Ninth Circuit has held that a "public entity may be liable under the Fourteenth Amendment for failing to 'institute readily available procedures for decreasing the risk of erroneous detentions.'"  Gant, 772 F.3d at 619 (quoting Fairley, 281 F.3d at 918).  However, as discussed above, the Ninth Circuit has also held that wrongful incarceration cases fall into two classes, the relevant class here being that the circumstances indicate that further investigation is

needed. See Garcia, 817 F.3d at 640; Gant, 772 F.3d at 621; Rivera, 745 F.3d at 391. Investigation is needed when there are "significant differences" between the subject of the warrant and the arrestee. See Garcia, 817 F.3d at 640; Gant, 772 F.3d at 621; Rivera, 745 F.3d at 391. In *Rivera*, the plaintiff relied heavily on *Fairley*. See Rivera, 745 F.3d at 390. The Ninth Circuit found that *Fairley* did not aid the plaintiff:

> In *Fairley*, the plaintiff, John, had been detained for twelve days "without any procedural safeguard in place to verify the warrant he was detained on was his and in the face of his repeated protests of innocence." Id. at 918. The *Fairley* court emphasized that John had been detained on a warrant, the subject of which was named "Joe" and differed from John in weight by 66 pounds, despite the defendants' awareness that John had a twin brother. Id. at 915. John was never brought before a judge to assert his claim of mistaken identity. On such facts, we held "there was sufficient evidence for a reasonable jury to find that John suffered a constitutional deprivation under the Fourteenth Amendment." Id. at 917.

> Rivera's reliance on *Fairley* is misplaced. Cases, like *Fairley*, holding that an incarceration based on mistaken identity violated the Due Process Clause are readily distinguishable from this case. They involved circumstances that might alert the defendants to a mistake of identity, withholding of a judicial forum for raising a claim of mistaken identity, or both.

Id. Similarly, in *Garcia*, the Ninth Circuit discussed wrongful detention cases in general and *Fairley* in particular:

> [*Lee v. City of L.A.*] held that a group of plaintiffs had alleged a Fourteenth Amendment violation based on city officials' "conscious failure to train their employees in the procedures necessary to avoid" mistaken misidentifications. Id. According to *Lee*, a plaintiff's burden is to show that defendants did not give him "minimum due process appropriate to the circumstances to ensure that his liberty was not arbitrarily abrogated." Id. (quoting Oviatt v. Pearce, 954 F.2d 1470, 1475 (9th Cir. 1992)) (internal alterations omitted). Our cases holding that a mistaken incarceration violated the Due Process Clause fit into at least one of two categories. Either "(1) the circumstances indicated to the defendants that further investigation was warranted, or (2) the defendants denied the plaintiff access to the courts for an extended period of time." Rivera, 745 F.3d at 391. Because Plaintiff does not allege that he was denied access to the courts, he must allege that "further investigation was warranted" based on the facts of his detention. Id.

> As observed in *Rivera*, the "further investigation" cases have involved significant differences between the arrestee and the true warrant subject. Id. For instance, in *Fairley v. Luman*, 281 F.3d 913, 915 (9th Cir. 2002) (per curiam), the plaintiff and the true warrant subject (who were twins) had different first names and differed in weight by 66 pounds. The booking sergeant knew that the plaintiff had a twin brother, but approved the plaintiff's booking based on a similarity in physical descriptions alone, without performing a readily available fingerprint comparison. Id. We concluded that the plaintiff had pleaded a due process violation in light of his detention "without any procedural safeguard in place to verify the warrant he was detained on was his and in the face of his repeated protests of innocence." Id. at 918. In light of the plaintiff's liberty interest, and the "minimum burden" to the

24

city of instituting procedures to verify identity, the city's procedures violated the Due Process Clause. Id.

More recently, in *Rivera*, plaintiff Santiago Rivera was misidentified and detained on a warrant meant for a different person with the same name, same date of birth, and similar physical characteristics (within one inch in height and ten pounds in weight). Rivera, 745 F.3d at 387. Holding that Rivera's detention did not violate the Due Process Clause, we distinguished *Fairley*, which involved circumstances that could alert the defendants to a misidentification, such as differences in first name and weight. Id. at 390-91. *Rivera*, by contrast, had not presented any evidence that the defendants knew he was not the true subject of the warrant, or that further investigation into his identity was called for based on what defendants did know. Id. at 391. Instead, as in *Baker*, deputies reasonably concluded that Rivera was the true warrant subject. Id.; see also Baker, 443 U.S. at 141

Garcia, 817 F.3d at 640-41.

From these sections, the Ninth Circuit views *Fairley* as falling under *Rivera*'s first category of wrongful detention cases because there were significant differences between the subject of the warrant and the arrestee, to wit a 66 pound weight difference and knowledge that the arrestee had a twin. Because there were significant differences between the arrestee and the subject of the warrant, the duty to further investigate was triggered. No further investigation appears to have occurred, and the law enforcement agency was responsible for the failure to further investigate and the resulting incarceration because it did not have practices in place to safeguard against mistaken identity.

Given the discussions of *Fairley* in *Garcia* and *Rivera*, the Court gleans that the Fourteenth Amendment is violated when there are substantial differences between an arrestee and the subject of the warrant, yet no additional investigation occurs. Further, if a law enforcement entity does not have policies in place that require at least readily available safeguards be utilized to further investigate identity, then the entity may face *Monell* liability. However, if there are not substantial differences between the arrestee and the subject of the warrant, then there is no duty to further investigate or utilize any additional safeguards for confirming identity. Here, because there were not substantial differences known to Richards, he was not obligated to further investigate Neylon's identity (beyond having spoken to Neylon, spoken to Neylon's husband, running a Livescan search, and comparing Neylon and her responses to the CLETS printout of Chapman).[18] See

---

[18] Neylon also relies on *Alvarado v. Bratton*. However, *Alvarado* is unpublished and pre-dates *Rivera* and *Garcia*. The Court is unaware of the Ninth Circuit addressing or relying on *Alvarado* since it was decided in 2008. Accordingly, the Court does not find *Alvarado* to be controlling, rather, *Rivera* and *Garcia* control this case.

Baker, 443 U.S. at 141; Garcia, 817 F.3d at 640-41.

In sum, because Neylon has not identified "significant differences" between herself and Chapman that were known to Richards, Richards did not breach a constitutional duty to further investigate Neylon's identity.  See Baker, 443 U.S. at 141; Garcia, 817 F.3d at 640; Rivera, 745 F.3d at 391.  Summary judgment in favor of Richards is appropriate.

(2)    Qualified Immunity

In the alternative, qualified immunity is appropriate.  As discussed above, *Gant*, *Lee*, and *Fairley* (and *Cannon*) are distinguishable from the facts of this case.[19]  The Court is unaware of any case in which the arrestee and the subject of the warrant shared the number and type of identifiers/characteristics, and where the differences were not substantial or significant.  Neylon cites no Ninth Circuit cases, Supreme Court cases, or a string of cases that establish a "robust body of law" that would have put Richards on notice that further investigation of Neylon's identity was constitutionally required, considering the similarities that existed between Neylon and Chapman and the investigation that had already occurred.  See Vos, 892 F.3d at 1035; Felarca, 891 F.3d at 822; Shafer, 858 F.3d at 1117-88.  Qualified immunity in favor of Richards on this claim is proper.

b.    Durbin

(1)    Constitutional Violation

Initially, the FAC expressly states that the § 1983 inadequate investigation claim is alleged against Sheriff Lutze and Richards, Durbin is not listed as a defendant.[20]  That is, the FAC does not contain a claim against Durbin and does not give him notice of inadequate investigation claim.  Raising this claim in opposition to summary judgment is generally improper.  See Navajo Nation v. United States Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008).

Apart from the pleading deficiency in the FAC, Neylon has not demonstrated what significant differences existed between herself and Chapman, relative to the information that was

---

[19] *Garcia* was decided in 2016 and thus, cannot constitute a part of the clearly established law that existed at the time of Neylon's December 2015 arrest.

[20] Neylon's opposition clarifies that Sheriff Lutze's liability is premised on his policy-making and supervisory capacities.  Therefore, Sheriff's Lutze's liability will be addressed under the Fourth and Fifth Causes of Action, *infra*.

known to Durbin.  See Garcia, 817 F.3d at 641.  As discussed above, there is no height difference and no material difference in weight between Chapman and Neylon, which distinguishes this case from *Garcia*, *Gant*, and *Fairley*.  At the time of arrest, the only differences that could have been known to Durbin were the difference in hair color and the tattoo on Chapman's ankle, but hair color is easily changed and tattoos can be removed.  These are not necessarily immutable characteristics, especially considering the eleven year gap between the arrest and the warrant.

It is true that Durbin did see a picture of Chapman sometime after Neylon's arrest but before her release.  It is unknown when Durbin saw this picture and whether Durbin could have reasonably engaged in a further investigation prior to Neylon's release.  Assuming without deciding that a meaningful investigation could have been accomplished, the picture from the Indiana wanted flyer reflects possibly a difference in skin tone.  Case law indicates that a difference in skin tone is a minor difference, which would not trigger a constitutional obligation to further investigate Neylon's identity.  See Martinez, 340 F. App'x at 701-02.

In sum, because there is no inadequate investigation claim in the FAC against Durbin, and no "significant differences" were known to Durbin between Chapman and Neylon, summary judgment on this claim is appropriate.

### (2)    Qualified Immunity

In the alternative, for the same reasons that qualified immunity is appropriate for Richards, it is appropriate for Durbin.  *Gant*, *Lee*, and *Fairley* (and *Cannon*) are distinguishable from the facts of this case, and no cases have been cited in which the arrestee and the subject of the warrant shared the number and type of identifiers/characteristics and where the differences were not substantial or significant.  Qualified immunity in favor of Durbin on this claim is appropriate.

### 3.    Third Cause of Action – § 1983 – Malicious Prosecution

#### *Defendants' Argument*

Richards argues that summary judgment is appropriate *inter alia* because probable cause supported the decisions to arrest and prosecute, even though he did not make the decision to arrest and was not involved in the decision to prosecute.  Richards argues that Neylon cannot rebut the presumption of prosecutorial independence with respect to the decision to file charges against her.

There is no evidence that Richards had anything to do with the decision to prosecute.  However, even assuming Richards misled prosecutors, probable cause still existed for the prosecution when the misleading evidence is not considered.

*Plaintiff's Opposition*

Neylon argues that summary judgment is improper.  Neylon argues that Richards's involvement in the arrest was substantial and that probable cause for the arrest did not exist. Further, Richards had the intent to deny her the right to an adequate or further investigation and the right to adequate procedures to safeguard against misidentification.  Further, there is evidence to rebut the presumption of prosecutorial independence.  E-mails from the Inyo District Attorney's Office, as well as the identity hearing testimony elicited by the District Attorney, show that Richards misled the District Attorney into believing that the Livescans resulted in a "hit."

*Legal Standard*

In general, a claim of malicious prosecution is not cognizable under § 1983 "if process is available within the state judicial systems" to provide a remedy, although "[the Ninth Circuit has] also held that an exception exists . . . when a malicious prosecution is conducted with the intent to . . . subject a person to a denial of constitutional rights."  Lacey v. Maricopa Cnty, 693 F.3d 896, 919 (9th Cir. 2012); Bretz v. Kelman, 773 F.2d 1026, 1031 (9th Cir. 1985) (en banc). To maintain a § 1983 claim for malicious prosecution, a plaintiff must allege "that the defendants prosecuted her with malice and without probable cause, and that they did so for the purpose of denying her equal protection or another specific constitutional right."  Lacey, 693 F.3d at 919; Smith v. Almada, 640 F.3d 931, 938 (9th Cir. 2011); Awabdy v. City of Adelanto, 368 F.3d 1062, 1066 (9th Cir. 2004).  Further, a plaintiff must show that the prior prosecution terminated in a manner that indicates innocence, i.e. a favorable termination.  Lacey, 693 F.3d at 919; Awabdy, 368 F.3d at 1066-68. Claims of malicious prosecution may be brought against police officers or others who wrongfully caused the prosecution to occur.  Smith, 640 F.3d at 938; Awabdy, 368 F.3d at 1066. Probable cause is an absolute defense to a malicious prosecution claim.  Smith, 640 F.3d at 938; Lassiter v. City of Bremerton, 556 F.3d 1049, 1054-55 (9th Cir. 2009).  "Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of

the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings." Awabdy, 368 F.3d at 1067. However, if a plaintiff can show that an officer applied improper pressure on the prosecutor, or knowingly provided a district attorney with misinformation, or concealed exculpatory information, or otherwise engaged in wrongful conduct, the presumption of prosecutorial independence may be rebutted. See id.

*Discussion*

To rebut the presumption of prosecutorial independence, see Awabdy, 368 F.3d at 1067, Neylon argues that charges were filed against her and that she was prosecuted by the Inyo District Attorney based on false statements by Richards. PUMF 81 reads: "The acceptance [by the District Attorney] was based on Richards's misleading and providing false statements to the Inyo County District Attorney's Office, causing prosecutors to believe that 'the live-scan resulted in a hit' between [Neylon] and Melissa Chapman." The only evidence cited in support of PUMF 81 is a June 29, 2016 e-mail from Inyo County Deputy District Attorney Dee Shepherd to Marlena Baker (it is unknown who Marlena Baker is). This e-mail reads:

> In reviewing the e-mails and my recollection, the Dearborn DA's office had the fingerprints from the Melissa Neylon we had in custody compared with the fingerprints they had on file. Based on that comparison, they determined the Neylon we had in custody was not the Neylon they were looking for and sent us a letter advising they were no longer seeking extradition. Unfortunately, the file lives in Indy, so I don't have it in Bishop to review all of my notes and documents. As for how the live-scan resulted in a hit, that ia an issue to take up w/ the Sheriff's Office or DOJ. Let me know if you need anything else and I will get the file.

Merin Dec. Ex. 18.

Viewing this e-mail in the light most favorable to Neylon, the Court cannot hold that it supports the proposition that the District Attorney's Office accepted the case against Neylon based on Richards's conclusion regarding the December 4 Livescan results. The e-mail in no way explains why charges were brought by the District Attorney. In fact, the e-mail is clearly responding to an unknown inquiry by Marlena Baker, whoever she may be. There is nothing in the e-mail that fairly purports to explain the District Attorney's reasoning or rationale for bringing charges, the e-mail does not in any way discuss probable cause, and the e-mail does not indicate

that charges would not have been pursued but for Richards's interpretation of the Livescan results. Further, the e-mail does not indicate what information was actually conveyed by Richards to the District Attorney's Office, and the e-mail does not indicate that Richards was consulted prior to filings charges. At best, the Deputy District Attorney assigned to Neylon's case referenced a Livescan hit in an e-mail, but the context of the reference is unclear. Merely referencing a hit does not adequately show that the report of a Livescan "hit" was the basis for the charges. The June 26 e-mail does not rebut the presumption of prosecutorial independence.

With respect to Richards's Identity Hearing testimony, it is reasonable to infer that Richards spoke to Shepherd sometime prior to the December 18 Identity Hearing about Livescan. It is also reasonable to assume that Shepherd relied on what Richards told her about Livescan for the purpose of presenting testimony at the Identity Hearing. That is, it can be assumed that Richards's testimony is consistent with what he told Shepherd. However, at best, the testimony can only reasonably be viewed as possibly impacting the Identity Hearing. There is nothing in the cited testimony relating to what Richards told the District Attorney prior to the decision to file charges, nor is there anything in the cited testimony that reflects on the importance of any information that Richards may have conveyed to the ultimate decision to file charges. The testimony also does not indicate that the District Attorney's Office would not have brought or pursued charges against Neylon but for Richards's testimony.

However, even assuming that the Inyo District Attorney considered and relied on a false Livescan "hit" as reported by Richards, there was still probable cause to believe that Neylon was Chapman separate and independent of the Livescan results. As discussed above, the Indiana warrant was active and valid, the warrant was for identity theft (which would involve the use of false names and birth dates), Neylon and Chapman had used three identical names in the past, both had brown eyes, both were 5' 3" tall, both had used an identical birth date, both could reasonably be described as Caucasian, and both had similar weights. Thus, "even after correcting for the allegedly false and omitted information" from Richards, "probable cause supported [Neylon's] arrest . . . . For the same reason, probable cause supported [Neylon's] prosecution." Smith, 640 F.3d at 938.

In sum, Neylon has not shown that Richards's false interpretation of the Livescan results was the basis for the Inyo District Attorney to bring charges against her, and after excising the false Livescan "hit" evidence, there was sufficient probable cause for Neylon's arrest and prosecution. Because probable cause existed, summary judgment in favor of Richards on this claim is appropriate. See id.; Lassiter, 556 F.3d at 1054-55.

4.     Fourth & Fifth Causes of Action – § 1983 – Inadequate Policies, Customs, or Practices & Ratification

When a plaintiff suffers no constitutional violation, neither a municipality nor a supervisor may be held liable under § 1983. See Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Simmons v. Navajo County, 609 F.3d 1011, 1021 (9th Cir. 2010); Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir. 2001); Quintanilla v. City of Downey, 84 F.3d 353, 355 (9th Cir. 1996). Here, because the Court has determined that there was no unconstitutional arrest, investigation, or prosecution, Inyo County and Sheriff Lutze cannot be liable for an unconstitutional arrest, investigation, or prosecution caused by inadequate policies, customs, or practices.

Citing Gibson v. County of Washoe, 290 F.3d 1175 (9th Cir. 2002) and Chew v. Gates, 27 F.3d 1432 (9th Cir. 1994), Neylon argues that even if Durbin and Richards did not commit constitutional violations, that does not extinguish "Monell liability."

Neylon is correct that it is possible for liability to attach to a municipality under § 1983 when individual officers are exonerated. See Fairley, 281 F.3d at 916-17 (discussing cases including Chew). Liability will attach to a municipality under § 1983, despite the exoneration of its officers, if a constitutional injury was nevertheless caused by the municipality itself through its policies, customs, or practices. See id. A constitutional violation remains the "touchstone of § 1983 liability," even when individual officers are exonerated. Id. Gibson and Chew are consistent with this rule. However, Fairley, Gibson, and Chew do not establish liability in this case.

Gibson held Washoe County liable for conduct that occurred prior to the involvement of the absolved officers. In other words, Washoe County was responsible for a constitutional violation apart from and prior to the actions of the defendant officers. See Gibson, 290 F.3d at 1186 n.7; cf. Fairley, 281 F.3d at 916-17. Here, Neylon has not identified a constitutional injury

31

1  inflicted by Inyo County that is separate from the actions of Durbin or Richards, which were not

2  unconstitutional.

3      In *Chew*, a police officer was exonerated through qualified immunity, but the Ninth Circuit

4  held that the municipality was not correspondingly exonerated and may still be held liable for the

5  constitutional violation.  See Chew, 27 F.3d at 1439.  Here, the Court has held that there were no

6  constitutional violations, but only addressed qualified immunity as alternative holdings.  Thus, this

7  aspect of *Chew* has no application in this case.  *Chew* also held that alternative theories based on

8  actions other than by the officer in question could form the basis for municipal liability.  See id. at

9  1445.  This is another way of holding that the municipality must have caused an injury through a

10 policy, custom, or practice that is separate from the actions of an absolved officer, i.e. conduct

11 apart from that which has been found to be constitutional.  Again, Neylon has not identified any

12 constitutional injury by Inyo County or Sheriff Lutze that is separate from the actions of Durbin

13 and Richards.

14     The evidence before the Court establishes probable cause for the arrest and prosecution,

15 and does not establish that there were "significant differences" between Neylon and Chapman that

16 would trigger a duty to further investigate Neylon's identity.  Neylon has not established that she

17 suffered a constitutional violation by Inyo County or Sheriff Lutze.  Thus, summary judgment in

18 favor of the County and Sheriff Lutze is appropriate.  See Heller, 475 U.S. at 799; Simmons, 609

19 F.3d at 1021; Fairley, 281 F.3d at 916-17; Jackson, 268 F.3d at 653; Quintanilla, 84 F.3d at 355.

20          5.      Remaining State Law Claims

21     This Court has supplemental jurisdiction over Neylon's state law claims.  Under 28 U.S.C.

22 § 1367(c)(3), a district court may decline to exercise jurisdiction over supplemental state law

23 claims if "the district court has dismissed all claims over which it has original jurisdiction."  The

24 general rule is "when federal claims are dismissed before trial . . . pendent state claims should also

25 be dismissed."  Religious Tech. Ctr v. Wollersheim, 971 F.2d 364, 367-68 (9th Cir. 1992); Schultz

26 v. Sundberg, 759 F.2d 714, 718 (9th Cir. 1985).  Considering judicial economy, convenience,

27 fairness, and comity, and because summary judgment has been granted on all of Neylon's federal

28 claims, the Court will decline to exercise supplemental jurisdiction over Neylon's remaining state

law claims.[21]  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); City of Colton v. Am. Promotional Events, Inc.-West, 614 F.3d 998, 1008 (9th Cir. 2010) ("Because the district court did not err in granting summary judgment on the federal claims, it did not abuse its discretion in dismissing the state-law claims."); Religious Tech., 971 F.2d at 367-68.

**II.    Neylon's Motion To Amend**

Neylon has filed an opposed motion to amend her complaint to include claims under California Civil Code § 52.1.  See Doc. No. 70.  However, because all of Neylon's federal claims will be dismissed, and the Court is declining to exercise supplemental jurisdiction over the remaining state law claims, the Court will deny without prejudice the motion to amend.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.    Defendants' motion for summary judgment with respect to the first, second, third, fourth, and fifth causes of action is GRANTED;

2.    Pursuant to 28 U.S.C. § 1367(c)(3), the Court DECLINES to exercise supplemental jurisdiction over Plaintiff's remaining state law claims;

3.    Plaintiff's motion to amend (Doc. No. 70) is DENIED without prejudice, due to the Court declining to exercise supplemental jurisdiction with respect to Plaintiff's state law claims; and

4.    The Clerk is directed to CLOSE this case.

IT IS SO ORDERED.

Dated:   August 3, 2018            _____
                                   SENIOR  DISTRICT  JUDGE

---

[21] Under 28 U.S.C. § 1367(d), the limitations period for state law claims are tolled while the claim is pending and for a period of 30 days after dismissal from federal court, unless state law provides for a longer period.  See 28 U.S.C. § 1367(d); Jinks v. Richland Cnty., 538 U.S. 456, 462-63 (2003).